**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

UNITED STATES OF AMERICA,

       **Plaintiff,**

    **v.**                 **Crim. Action No. 2:19-cr-19**
                             **(Judge Kleeh)**

ROGER D. CLEM, JR. and
ALTON L. SKINNER, II,

       **Defendants.**

## MEMORANDUM ORDER DENYING GOVERNMENT'S MOTION TO CONTINUE [DKT. NO. 40], GRANTING DEFENDANTS' ORAL MOTIONS TO CONTINUE, AND RESCHEDULING PRE-TRIAL CONFERENCE AND TRIAL

This matter is before the Court on the *Motion to Continue* [Dkt. No. 40] filed by the Government in this case based on proposed Deferred Prosecution Agreements for Defendants Roger D. Clem, Jr. ("Clem") and Alton L. Skinner, II ("Skinner"). A hearing was held on October 7, 2019, at which the motion to continue was addressed [Dkt. No. 44].

For the reasons set forth on the record at the October 7, 2019, and explained herein, the Government's motion [Dkt. No. 40] is **DENIED** and the Proposed Deferred Prosecution Agreements [Dkt. No. 40-1 and 40-2] are **REJECTED.** The oral motions to continue the pre-trial conference and trial made by counsel for Defendants at the hearing are **GRANTED,** and the October 10, 2019, pre-trial conference and October 22, 2019, trial dates are **CONTINUED.** The **pre-trial conference** is now scheduled for **February 6, 2020, at 10:00 a.m.** at the Elkins, West Virginia point of holding court,

and the **jury trial** is scheduled for **February 18, 2020, at 9:30 a.m.** at the Ekins, West Virginia point of holding court.

## I.   Indictment and Background

On May 7, 2019, a Federal grand jury in Clarksburg, West Virginia returned an Indictment against Defendants Clem and Skinner, in their capacities as duly elected West Virginia Magistrate Judges in Lewis and Gilmer Counties [Dkt. No. 1]. The Indicted charges are as follows:  Count One charges Clem and Skinner with Conspiracy to Commit Mail Fraud and Wire Fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349; Counts Two and Three charge both Defendants with Wire Fraud, in violation of 18 U.S.C. § 1343; Counts Four and Five charge both Defendants with Mail Fraud, in violation of 18 U.S.C. § 1341; Counts Six and Eight charge Skinner and Clem, respectively, with Obstruction of Justice in violation of 18 U. S. C. § 1512(c)(2); Count Seven charges Skinner with False Statement to a Federal Agent in violation of 18 U.S.C. § 1001(a)(2) [Id.]. The Indictment further includes a forfeiture allegation against Defendant Skinner for property including, but not limited to, a money judgment of $18,900.00 [Id.].

The charges relate to Defendants' duties, as magistrates, required by West Virginia state law "to furnish a detainee with a written list of all persons engaged under the authority of the circuit court in the business of becoming surety for compensation,

when the detainee indicated a desire to communicate with a surety"
[Dkt. No. 1 at 2]. Clem was a duly elected Lewis County magistrate
authorized to admit bail in all criminal matters in Lewis County
except capital offenses [Id. at 1]. According to the Indictment,
Lewis County magistrates would present detainees "with a collage
of business cards of the bonding companies authorized to engage in
the business of becoming surety for compensation in criminal cases"
[Id. at 2]. E-Z-Out Bonding, LLC ("E-Z-Out") was a company
authorized to engage in the business of becoming a surety for
compensation in criminal cases in Lewis County, conditioned upon
it being underwritten by Lexington National Insurance Corporation
("Lexington National") [Id.]. Dave Bourne Bail Bonds, Inc. ("Dave
Bourne Bail Bonds") was a general agent of Lexington National
[Id.]. The Indictment explains that T.E.S. was an organizer and
sole member of E-Z-Out and worked as a bonding agent for the
company [Id.]. S.D.S. worked as a bonding agent for E-Z-Out [Id.].
Defendant Skinner, a duly elected Gilmer County magistrate, is the
spouse of T.E.S., and the father of S.D.S. [Id.]. In addition to
E-Z-Out, the following companies were authorized to engage in the
business of becoming surety for compensation in criminal cases in
Lewis County: A-1 Walton's Bonding and Bill's Bail Bonds, both of
Buckhannon, West Virginia; M&M Bonding, based in Clarksburg, West
Virginia; Minard's Bail Bonding, of Fairmont, West Virginia; AAA

Bail Bonds, based in Granville, West Virginia; and Weatherholz Bonding, LLC, of Cumberland, Maryland [Id. at 3].

The Indictment further alleges that the Central Regional Jail is in Flatwoods, Braxton County, West Virginia, and a jail at which Lewis County arrestees could be detained pending arraignment via video teleconference before a Lewis County magistrate and pending trial [Dkt. No. 1 at 3]. West Virginia law, West Virginia Code § 51-10-7, prohibits a bonding agent from entering a place of detention, including a county courthouse, for the purpose of obtaining employment as a bonding agent, without having been previously called by a detainee, or by some relative or other authorized person acting for or on behalf of the detainee [Id.].

The Indictment alleges that from on or about December 2016 and continuing through May 7, 2019, Defendants Clem and Skinner engaged in a conspiracy and scheme to defraud and obtain money and property from other authorized bond companies by means of materially false and fraudulent pretenses [Dkt. No. 1 at 4]. It is further alleges that the purpose and object of the conspiracy was to enrich Skinner through mail and wire fraud, and to hide, conceal, and cover up the Defendants' dealings with one another regarding E-Z-Out business [Id.]. The manner and means of Defendants' conspiracy include the following: Defendant Clem would take official actions favorable to E-Z-Out, including, but not limited to, setting an unnecessary surety bond; Clem would

make fraudulent comments to detainees and to friends and family of detainees that were favorable to E-Z-Out to the exclusion of the other bonding companies; Clem would conceal from detainees and friends and families of detainees certain material facts including, but not limited to, the existence of authorized bonding companies in addition to E-Z-Out; Clem would fail to disclose material facts, which he was under a legal, professional, and contractual duty to disclose, to detainees and to friends and family of detainees, and to other authorized bonding companies, including, but not limited to, his relationship with Defendant Skinner; Clem would call Defendant Skinner to arrange the bond of a detainee without presenting a list of authorized bonding companies to the detainee; Clem would call Defendant Skinner to arrange for T.E.S. or S.D.S. to be present at the arraignment of a detainee without being so requested by the detainee or a representative of the detainee and without presenting a list of authorized bonding companies to the detainee; Defendant Skinner would ensure the underwriting of E-Z-Out was maintained through Lexington National via use of the mail and interest and foreign wire transmissions; and Skinner would ensure the collection of the bonding fees, all in violation of 18 U.S.C. §§ 1341, 1343, and 1349 [Dkt. No. 1 at 4-5].

The Indictment states that on or about January 17, 2019, Defendant Skinner made false statements and representations during

an interview conducted in furtherance of a grand jury investigation as to his involvement with E-Z-Out and that he believed detainees had selected E-Z-Out from a list posted in the Lewis County courthouse [Dkt. No. 1 at 10].  It also alleges that on or about January 17, 2019, Skinner made a materially false, fictitious, fraudulent statement to a special agent of the Internal Revenue Service-Criminal Investigation concerning Skinner's involvement with E-Z-Out and his alleged belief that detainees had selected E-Z-Out from a list posted in the Lewis County courthouse [Id. at 11].  The Indictment further alleges that on or about February 27, 2019, Defendant Clem did corruptly attempt to obstruct a grand jury investigation by making false statements during an interview conducted in furtherance of the investigation [Id. at 12].  The false information included the following:  during arraignments, Clem presents detainees with a list of authorized bonding companies, comprised of a collage of business cards; he does not select the bonding company for the detainee; he had not directed bonds to E-Z-Out; he asks defendants "which one do you want, I will call for you"; if a defendant voluntarily appeared in court, he would not require the defendant to post bond to remain fee; no one had told him to stop calling E-Z-Out for defendants; and since a suspension of S.D.S., Clem had not admitted any defendants to the bail of E-Z-Out [Id.].

Defendant Clem filed a *Motion to Dismiss the Indictment for Insufficiency* on August 19, 2019 [Dkt No. 34] and Defendant Skinner filed his own motion on the same date [Dkt. No. 35].  The Government responded in opposition to the respective motions on August 26, 2019 [Dkt. No. 36].  The motions were referred to the magistrate judge for consideration by order entered on August 29, 2019 [Dkt. No. 37], and on September 13, 2019, Magistrate Judge Michael J. Aloi entered a Report and Recommendation ("R&R") recommending that the motions to dismiss be denied [Dkt. No. 39].  No objections were filed to the R&R and the Court adopted its recommendation by order entered October 2, 2019 [Dkt. No. 43].  After a continuance of the initial scheduling orders, the Defendants were scheduled for a pre-trial conference on October 10, 2019, at 12:30 p.m., and a jury trial on October 22, 2019, at the Elkins, West Virginia point of holding court [Dkt. No. 33].

## II. Government's Motion to Continue

On September 25, 2019, the Government filed a *Motion to Continue Trial* as to both Defendants, attaching proposed Deferred Prosecution Agreements ("DPAs") for each [Dkt. No. 40].  The Government requested that the Court continue the trial date "for the 12-month period contemplated" in the attached DPAs [Id. at 1, Exhs. 1 and 2].  The Government states that "[s]ubject to the approval of the Court, the defendants and the United States entered into DPAs … which contemplate the dismissal of the Indictment in

7

the event that the defendants successfully complete a 12-month diversion program" [Id. at 2]. The Government confirmed that "[u]nlike a traditional pretrial diversion agreement, a deferred prosecution agreement is strictly between the parties and does not require oversight or any involvement from the United States Probation Office" [Id. at n.1].

In support for its request, the Government cited a decision by United States District Judge John Preston Bailey for the doctrine that "[t]he decision of whether a particular defendant may participate in a pretrial diversion program is entrusted to the United States Attorney," and that "these decisions are ill-suited for judicial review, and courts should be hesitant to examine the government's decision whether to prosecute" [Id. at 2 (citing United States v. Presgraves, Jr., 3:11-cr-38 (N.D.W. Va. Bailey) [Dkt. No. 22] (internal quotations and citations omitted))]. The Government argues that the period for delay for the purpose of allowing the Defendants to demonstrate their good conduct "is properly excluded from the Speedy Trial Act clock pursuant to 18 U.S.C. § 3161(h)(2)," which excludes "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct" [Id. at 2]. Defendants offered no objection to the continuance request [Id.], and the

motion was scheduled for hearing by order entered October 2, 2019 [Dkt. No. 41].

## A. Deferred Prosecution Agreement, Defendant Clem

The DPAs proposed by the Government and accepted by Defendants were attached as exhibits to the motion to continue [Dkt. Nos. 40-1, 40-2]. Defendant Clem's DPA is seventeen (17) paragraphs in length and includes provisions for the indictment, acceptance of responsibility, remedial actions, continuing obligation of cooperation, and deferral of prosecution [Dkt. No. 40-1]. Notably, the provision governing acceptance of responsibility states that Clem "accepts responsibility for the conduct set forth in the Indictment by entering into this agreement and by" (a) the remedial actions that he will take as described in the Agreement; (b) his commitment to full cooperation, also described in the agreement, with the Government and its law enforcement agency partners; (c) his agreement to fulfill all of the undertakings he has made in this agreement, "including his agreement to comply in the future with all federal and state criminal laws[1]" [Dkt. No. 40-1 at 2]. As to remedial actions, the DPA requires Clem to resign his position as Magistrate of Lewis County, West Virginia within seven (7) days of its execution and his agreement to never seek public

---

[1] Because compliance with all federal and state criminal laws is expected from every person in the state of West Virginia, it is not clear how Clem's agreement to meet this basic requirement of citizenship evidences his acceptance of responsibility for the indicted conduct.

office by election or appointment anywhere in the United States [Id.].  The DPA further sets forth Defendant Clem's agreement to cooperate with the West Virginia Judicial Investigation Commission[2] ("JIC") by entering into an agreement with "Judiciary Disciplinary Counsel within thirty (30) days of execution" of this agreement [Id.].

Defendant Clem's proposed DPA states that the Government conferred with West Virginia Judiciary Disciplinary Counsel, and that the JIC agreement for Clem shall include certain terms and conditions [Dkt. No. 40-1 at 2].  Clem will agree that "the JIC has sufficient evidence to support the following facts":  that

---

[2] In West Virginia, the Supreme Court of Appeals has plenary rule-making authority, and the rules it adopts have the force and effect of a statute.  W. Va. Cost., art. VIII, §§ 3 and 8.  The Court has "general supervisory control over all intermediate appellate courts, circuit courts and magistrate courts.  W. Va. Cost., art. VIII, § 3.  The Court has the authority to "prescribe, adopt, promulgate, an amend rules prescribing a judicial code of ethics, and a code of regulations and standards of conduct and performances for justices, judges and magistrates, along with sanctions and penalties for any violation thereof."  W. Va. Const., art. VIII, § 8.  The West Virginia Constitution affords a justice, judge or magistrate due process before receiving any sanction or penalty.  Id.  A justice or judge may only be removed from office by impeachment by the West Virginia Legislature, and a magistrate may only be removed from his office in the manner provided by law for removal of county officers.  Id.  The Judicial Investigation Commission ("JIC") was created by the Court in 1982 and is governed by the Rules of Judicial Disciplinary Procedure ("RJDP").  The JIC has nine (9) members:  three circuit judges; one magistrate; one family court judge; one retired circuit judge; and three members of the public.  W. Va. RJDP 1.1.  The Court appoints all members, who serve staggered terms of three years.  W. Va. RJDP 1.2 and 1.3.  The authority of the JIC is limited and set forth at RDJP 1.11.  Among its authority is the ability to determine whether probable cause exists to formally charge a judge with a violation of the Code of Judicial Conduct or that a judge should not continue to serve, and to inform the public about the existence and operation of the judicial disciplinary system, the filing of formal charges, and the discipline imposed or recommended on formal charges.  W. Va. RJDP 1.11.  JIC meetings are not open to the public and the JIC is not subject to the Open Governmental Proceedings Act at W. Va. Code § 6-9A-1, et seq.  Also, the JIC is not a public agency under W. Va. Code § 6-9A-2(7).  Accordingly, all proceedings of the JIC are confidential unless they result in an admonishment or formal statement of charges.

from about March 2017 to about March 2018, Defendant Skinner was significantly involved in the operation of a bail bonding company called E-Z-Out in Lewis County, West Virginia, and that during this period, Clem was a Lewis County magistrate who admitted multiple defendants to the bail of E-Z-Out; that during the same period, Clem used his cell phone approximately two-hundred (200) times to call E-Z-Out, usually calling the cell phone of Skinner; the majority of the telephone calls were in close proximity to arraignments conducted by Clem and related to bonding, and following these phone calls, Skinner would ensure that an E-Z-Out bonding agent appeared at the Lewis County courthouse to post bonds; and that during the same period, on multiple occasions, Clem willfully failed to present a list of authorized bail bonding companies to a detainee, and instead called Skinner directly to ensure that E-Z-Out would be the company to post the bond [Id. at 2-3]. Additional proposed terms and conditions include: that Clem will not contest that he violated Rules 1.1, 1.2, 1.3, 2.4(B), and 2.13(A) of the Code of Judicial Conduct as a result of the above facts; that he will resign his position as magistrate; that he will agree to never again seek public office by election or appointment in West Virginia; that he will "agree with the Judicial Disciplinary Counsel to jointly recommend to the Judicial Hearing

Board and the Supreme Court of Appeals of West Virginia[3] that"
Defendant Clem be censured, that he pay a fine in the amount of
$1,000.00, and that he pay the costs of the disciplinary
proceedings "and no further sanctions"; that he will agree that
the decision to accept the recommendation of censure, fine and
costs rests solely within the purview of the Judicial Hearing Board
and the Supreme Court of Appeals of West Virginia, and that the
hearing board and the Court "have the authority to recommend or
give either more or less severe sanctions outlined in Rule 41.2 of
the West Virginia Rules of Disciplinary Procedure"; and that Clem
will agree that if at a future time he seeks public office, the
action would void the JIC agreement and the JIC "would be able to
take such further action on the matter as it deems appropriate"
[Id. at 3-4].

The DPA for Clem also contains a section applicable to his
continuing obligation of cooperation [Dkt. No. 40-1 at 4-6]. It
provides that Clem agrees to cooperate fully and actively with the
Government regarding any matter about which the Government may
inquire [Id. at 4]. Defendant Clem's continuing cooperation terms
are detailed in seven (7) subparagraphs and include: making
truthful disclosures; providing all records in his custody or

---

[3] The JIC process requires that the JIC, through the Judicial Disciplinary
Counsel, make a recommendation to the Judicial Hearing Board and the Court as
to what action should be taken. The Court decides whether to accept the
recommendation and what sanction, if any, to impose.

control as requested by the Government; proactively disclosing information of any criminal wrongdoing or suspected wrongdoing which has not yet been explicitly disclosed to the Government and which is either currently in Clem's possession or which may come into his possession; making himself available to provide information or testimony as requested by the Government[4]; providing testimony or information to authenticate or establish the basis for admission of records or physical evidence "concerning the conduct set forth in the Indictment"; consenting to the Government's disclosures of materials provided to such agencies as the Government deems appropriate; and providing active assistance to the Government [Id. at 5-6]. The cooperation condition also clarifies that "Clem's obligation to cooperate is not intended to apply in the event that he is a defendant in any such proceeding" [Id. at 6].

The DPA proposed for Defendant Clem specifically states that:

[i]n consideration of Defendant Clem's remedial actions to date and his commitment to (a) accept and acknowledge responsibility for his conduct, (b) continue his cooperation with the Office [Government], (c) comply with federal and state criminal laws and (d) otherwise comply with all of the terms of this Agreement, the Office shall, following execution of this Agreement, file a joint motion with Defendant Clem pursuant to Title 18, United States Code, Section 3161(h)(2), to defer the prosecution for a period of twelve (12) months and to obtain an exclusion of time under the Speedy Trial Act

---

[4] This condition also contains this proviso: "Cooperation under this paragraph shall include identification of witnesses who, to Defendant Clem['s] [sic] knowledge and information, may have material information concerning the conduct set forth in the Indictment" [Dkt. No. 40-1 at 5].

to allow Defendant Clem to demonstrate good conduct and compliance with he terms of this Agreement (the "§ 3161(h)(2) Motion").

[Dkt. No. 40-1 at 6-7]. This section states that if Clem complies with all of the obligations of the DPA for the 12-month period, the Agreement shall expire, and the Government will move the Court to dismiss the Indictment with prejudice [Id. at 7]. "Except in the event of a breach of this Agreement," the Government will bring "no additional charges against Defendant Clem relating to or arising out of the matters set forth in the Indictment" [Id.]. The DPA prohibits Clem from making any public statement contradicting his acceptance of responsibility for the stipulated conduct in the JIC agreement and that any such contradictory statement shall constitute a breach of the Agreement [Id. at 9]. Defendant Clem can avoid a "finding of breach … by publicly repudiating such statement within seventy-two (72) hours after receipt of notice" by the Government [Id.].

### B. Deferred Prosecution Agreement, Defendant Skinner

The proposed DPA for Defendant Skinner is nearly identical to that for Clem and consists of eighteen (18) paragraphs [Dkt. No. 40-2]. An exception includes one additional remedial action for Skinner – that he agrees to "never again be involved in the bail bonding business anywhere in the United States" [Id. at 2]. The remaining substance of the Agreement matches the Government's proposed DPA for Defendant Clem. Noticeably absent from Defendant

14

Skinner's DPA is a provision to address the forfeiture allegation in the Indictment, which alleges that Skinner benefited financially from the Defendants' bail bond scheme in the amount of $18,900.00 [Id.]; [Dkt. No. 1 at 13].

### III. Legal Standard

The motion to continue was brought pursuant to 18 U.S.C. § 3161(h)(2).  Title 18, United States Code 3161 governs time limits and exclusions applied to defendants charged with a federal offense and codifies the Speedy Trial rights of defendants.  The relevant language relied on by the parties states:

> The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence: …
> (2) Any period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct.

18 U.S.C. § 3161(h)(2).

The Speedy Trial Act generally requires a defendant be tried within 70 days of either the filing of an indictment or appearing before a judge, whichever is later.  18 U.S.C. §3161(c)(1); See United States v. Shealey, 641 F.3d 627, 632 (4th Cir. 2011).  All defendants joined for trial fall within the speedy trial computation of the latest codefendant.  Id. (quoting Henderson v. United States, 476 U.S. 321, 323 n.2 (1986); United States v. Jarrell, 147 F.3d 315, 316 (4th Cir. 1998)).  If one codefendant

files a motion to continue and the district court grants it, that time is excluded as to all codefendants.  <u>United States v. Sarno</u>, 24 F.3d 618, 622 (4th Cir. 1994).

## IV.  Discussion

As discussed at the October 7, 2019, hearing, the parties do not believe that the Court has the authority to review the DPAs in the context of the requested motion to continue and approval of the exclusion of delay during the period of deferral of prosecution.  Despite the plain language of 18 U.S.C. § 3161(h)(2), the Government argued at hearing that the Fourth Circuit Court of Appeals' decision in <u>United States v. Richardson</u>, 856 F.2d 644 (4th 1988) precludes this Court from reviewing its decision to defer prosecution of Defendants and the substance of the proposed DPAs. However, <u>Richardson</u> is distinguishable from this matter.  First, it involved pretrial diversion agreements that are actively monitored by United States Probation and not DPAs as proposed here. Also, the defendant in <u>Richardson</u> was not in a position of public trust or alleged to have committed federal offenses while serving in an elected office.  Rather, <u>Richardson</u> involved a defendant who argued that he should have been offered pretrial diversion like other similarly situated defendants.  The court properly held that a defendant has no right to be placed in pretrial diversion. <u>Richardson</u>, 856 F.2d at 647 (citing <u>United States v. Hicks</u>, 693 F.2d 32, 34 (5th Cir. 1982), <u>cert.</u> <u>denied</u>, 459 U.S. 1220 (1983)),

and that "[t]he decision of whether a particular defendant will be allowed the opportunity to participate in the program in one entrusted to the United States Attorney." Id.; See also Wayte v. United States, 470 U.S. 598 (1985). At hearing, the Government reiterated Richardson's statement that "[t]hese decisions are 'particularly ill-suited to judicial review.'" Id.; Wayte, 470 U.S. at 607-08. However, this is simply not true for DPAs being reviewed in the context of a request to hold a prosecution in abeyance and toll the speedy trial clock. See United States v. McCrae, No. 3:09-cr-00008, 2009 WL 3172813 (W.D. Va. Oct. 1, 2009) (finding that 18 U.S.C. § 3161(h)(2) requires by its plain language a *written* agreement between the parties to defer prosecution, and the approval of the Court)(emphasis in original). Put simply, the parties' shared position renders the statutory language "*with court approval*" without practical effect. 18 U.S.C. § 3161(h)(2) (emphasis added). The Court does not believe Congress frivolously includes superfluous, meaningless phrases in the United States Code.

Because Defendants Clem and Skinner were indicted for serious felonies allegedly committed while they held public offices to which they were elected by the residents of Lewis and Gilmer Counties, the Court cannot agree that its role is limited to simply approving a delay under the Speedy Trial Act. In this regard, the Court finds instructive the analysis in United States v. HSBC Bank

USA, N.A., No. 12-cr-763, 2013 WL 3306161 (E.D.N.Y. July 1, 2013)[5].

The court in <u>HSBC Bank</u> found that it has "authority to approve or reject the DPA pursuant to its supervisory power." <u>HSBC Bank</u>, 2013 WL 3306161, at *4. This "supervisory power … permits federal courts to supervise 'the administration of criminal justice' among the parties before the bar." <u>Id.</u> (citing <u>United States v. Paynter</u>, 447 U.S. 727, 735 n.7 (1980) (additional quotation omitted)). Importantly, the courts have wielded this authority substantively, that is, to provide a remedy for the violation of a recognized right of a criminal defendant. <u>Id.</u> (citing <u>McNabb v. United States</u>, 318 U.S. 332, 345 (1943)(holding that "a conviction resting on evidence secured through … a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices to willful disobedience of law")). A primary purpose of the

---

[5] The Court is mindful that the district court considering the <u>HSBC Bank</u> matter, the Eastern District of New York, issued a few decisions related to the DPA in that case, and that one of the later decisions, <u>United States v. HSBC Bank USA, N.A.</u>, No. 12-cr-763, 2016 WL 347670 (E.D.N.Y. Jan. 28, 2016), was reversed by the United States Court of Appeals for the Second Circuit. <u>See</u> <u>United States v. HSBC Bank USA, N.A.</u>, 863 F.3d 125 (2nd Cir. 2017); <u>See also</u> <u>United States v. Fokker Services B.V.</u>, 818 F.3d 733 (D.C. Cir. 2016). However, the reasoning of United States District Judge John Gleeson in reviewing the DPA under the Court's supervisory power is sound, and there is no direct precedent from the Fourth Circuit on the issue of the standard of review to be applied by a district court when reviewing a motion to continue under 18 U.S.C. § 3161(h)(2). The Court also did not find another instance of DPAs as proposed by the Government having been utilized in another matter involving elected public officials who were indicted for conduct directly related to their public duties while in office. At hearing, the parties were also unable to recall a similar use of DPAs. The Court finds this distinction significant given the nature of conduct alleged in the Indictment.

court's supervisory power is to protect the integrity of judicial proceedings. 2013 WL 3306161, at *3 (citing <u>United States v. Hasting</u>, 461 U.S. 499, 526 (1983)("[O]ur cases have acknowledged the duty of reviewing courts to preserve the integrity of the judicial process.")); <u>See also</u>, <u>Mesarosh v. United States</u>, 352 U.S. 1 (1956) ("This is a federal criminal case, and this Court has supervisory jurisdiction over the proceedings of the federal courts. If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted."); <u>McNabb</u>, 318 U.S. at 347 ("We are not concerned with law enforcement practices except in so far as courts themselves become instruments of law enforcement.").

As noted by the court in <u>HSBC Bank</u>, under a plain reading of 18 U.S.C. § 3161(h)(2), "a court is to exclude the delay occasioned by a deferred prosecution agreement, but only upon approval of the agreement by the court." 2013 WL 3306161, at *3. This reading of the code section "is buttressed by the legislative history of the provision," and "'assures that the court will be involved in the decision to divert and that the procedure will not be used by prosecutors and defense counsel to avoid the speedy trial time limits.'" <u>Id.</u> (citing S. REP. No. 93-1021, at 37 (1974)). While the Speedy Trial Act is silent as to the standard the court should employee when evaluating "whether to grant 'approval' to a deferred prosecution agreement under 18 U.S.C. § 3161(h)(2)," the

legislative history of the provision and language itself "appears to instruct courts to consider whether a deferred prosecution agreement is truly about diversion and not simply a vehicle for fending off a looming trial date." Id.; See S. REP. No. 93-1021, at 37 (1974). As the court explained, "the question of whether to exclude the duration of the DPA from the speedy trial clock hinges on a determination of whether the Court approves the DPA." Id.

As Judge Gleeson noted, "it is easy to imagine circumstances in which a deferred prosecution agreement, or the implementation of such an agreement, so transgresses the bounds of lawfulnesss or propriety as to warrant judicial intervention to protect the integrity of the Court." HSBC Bank, 2013 WL 3306161, at *6. Such circumstances appear to be presented by the DPAs offered to Defendants here. Counsel for Defendants admitted at the October 7, 2019, hearing that the sanctions available to the JIC that may address Defendants' conduct are extremely limited. Defendants are already suspended without pay from their positions as county magistrates and they are not attorneys who are subject to licensure action by the West Virginia Office of Disciplinary Counsel. Moreover, the JIC does not need this Court to take any action to adjudicate any complaints before it or to proceed with the agreements it has negotiated with Defendants.[6] In short, under

---

[6] The JIC agreements are outlined in the proposed DPAs and include a censure for each Defendant, a fine of $1,000.00, costs for the JIC proceeding, and an

the DPAs, Defendants are free to immediately return to the livelihoods they enjoyed before serving as magistrates without any oversight by a government agency or conditions to satisfy other than to follow state and federal law and not seek public office.[7] And this resolution is proposed despite a federal grand jury indicting Defendants for felonies that occurred while they held positions of public trust, and finding that at least one Defendant derived a financial benefit of $18,900.00 from the scheme.

Additionally, any fine the JIC would impose as part of an agreement would be minimal given that the Indictment alleged that Defendant Clem forced at least some individuals to obtain cash for bonds from E-Z-Out when they may not otherwise have been required to do so for their cases [Dkt. No. 1 at 7]. As individual state criminal defendants who were charged and who appeared before Defendant Clem in his role as magistrate judge were not contacted by the Government about the proposed continuance or identified as victims in the Indictment, the Court presumes that they were not

---

agreement not to seek public office by election or appointment [Dkt. Nos. 40-1 at 2-4; 40-2 at 2-4].

[7] Indeed, at the October 7, 2019, hearing, counsel for Defendants confirmed their plan to request that Defendants be released from all pre-trial conditions ordered by this Court on May 22, 2019, upon approval of the Government's request for continuance and the DPAs. Specifically, counsel for Defendants expressed significant concern about Defendants' ability to possess firearms in time for "hunting season." The Court can think of no other federal criminal defendants who would be given similar treatment when charged with significant felonies, including obstruction of justice and lying to a federal agent. This disparity cannot be supported by the DPAs as presented.

notified about the DPAs.  This hardly seems just given the scheme engaged in by Defendants as outlined in the Indictment.  That any person may have been required to obtain a bond from a company so closely related to Defendant Skinner in order to gain his or her freedom or secure a court appearance is egregious.[8]  It is also troubling that the Government's proposed DPAs appear not to have considered this particular consequence of Defendants' conduct. For these reasons, and all those stated during the October 7, 2019, hearing, the Court does not approve of the proposed DPAs and cannot grant the Government's request for continuance.

The Court is mindful that it has no power to compel the Government to prosecute the pending charges against Defendants Clem and Skinner.  However, where the Government asks the Court to defer the prosecution of an Indictment returned by a grand jury, without any proposed compliance monitoring or oversight of Defendants by an agency or administrative body capable of enforcing meaningful sanctions, the integrity of the Court is implicated.

---

[8] The Annual Statistical Report for the West Virginia Court System for 2018 ("2018 Statistical Report") shows that the magistrate judges in Lewis County, West Virginia handled 2,595 criminal cases during 2018, with 108 worthless check cases, 184 felony cases, and 2,303 misdemeanor cases. See The Annual Statistical Data Report for Circuit, Family and Magistrate Courts, The West Virginia Court System, Admin. Off. of the Sup. Ct. of Appeals of W. Va. (2018).  These numbers do not include the civil case filings or juvenile case proceedings handled by the magistrate judges in Lewis County, West Virginia.  Id.  The 2018 Statistical Report also shows that the magistrate courts for West Virginia's fifty-five (55) counties handled 149,678 criminal cases in 2018, while the circuit courts handled 43,285 criminal cases in 2018.  Id.  The potential impact that state magistrate judges have on criminal defendants who come before them cannot be ignored when this data is considered.

As held in HSBC Bank, "by placing the DPA on the Court's radar screen in the form of a pending criminal matter, the parties have submitted to far more judicial authority than they claim exists." HSBC Bank, 2013 WL 3306161, at *7. Pursuant to its authority under 18 U.S.C. § 3161(h)(2), the Court will not exclude the one-year delay during a deferral of prosecution as proposed in the DPAs.

### V.    Conclusion

For the reasons stated herein:

(a)    The Government's *Motion to Continue* [Dkt. No. 40] is **DENIED** and the proposed Deferred Prosecution Agreements [Dkt. No. 40-1 and 40-2] are **REJECTED;**

(b)    Defendants' oral motions to continue the pre-trial conference and trial, made at the October 7, 2019, hearing, are **GRANTED**, and the relevant dates are **CONTINUED;** and

(c)    The **pre-trial conference** is scheduled for **February 6, 2020, at 10:00 a.m.** at the Elkins, West Virginia point of holding court, and the **jury trial** is scheduled for **February 18, 2020, at 9:30 a.m.** at the Elkins, West Virginia point of holding court.

(d)    In continuing the trial pursuant to the oral motions by Defendants, the Court has considered the factors outlined in 18 U.S.C. § 3161, and the Court finds that the ends of justice served by granting the continuance

outweigh the best interest of the public and the Defendant in a speedy trial. Specifically, the Court finds that this time should be excluded from speedy trial computation because the failure to grant a continuance "would deny counsel for the defendant(s) ... the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." <u>See</u> 18 U.S.C. § 3161(h)(7)(B)(iv). Additionally, the failure to grant the requested continuances would be likely to result in a miscarriage of justice. <u>See</u> 18 U.S.C. § 3161(h)(7)(B)(i).

It is so **ORDERED**.

The Court **DIRECTS** the Clerk to transmit copies of this Order to counsel of record and the appropriate agencies.

Dated: October 22, 2019

_____
THOMAS S. KLEEH
UNITED STATES DISTRICT JUDGE